**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


**Sleeper Village, LLC**

    **v.**                                    Case No. 09-cv-44-PB
                                              Opinion No. 2010 DNH 173
**NGM Insurance Company**


**MEMORANDUM AND ORDER**

Sleeper Village, LLC commenced this action by filing a
petition for declaratory judgment to recover under a performance
bond issued by NGM Insurance Company.  I determined in a prior
order that Sleeper Village failed to give NGM the notice of
surety default that it was entitled to receive under the bond.
In this order, I grant NGM's motion for summary judgment and hold
that Sleeper Village's failure to give the required notice bars
it from maintaining a claim under the bond.


**I.   INTRODUCTION**

Sleeper Village contracted with Moulton Construction Inc. to
build a residential development in three phases.  As the contract
required, Moulton purchased a performance bond from NGM covering
the first phase of the project.

**A.**   <u>**The Performance Bond**</u>

The bond is a standard form performance bond based on Form A312 issued by the American Institute of Architects.

Paragraph 3 of the bond identifies various conditions that must be satisfied before the surety is obligated under the bond. Under paragraph 3.1, the owner must first notify the contractor and the surety that "the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety."  If the conference does not resolve the dispute, paragraph 3.2 states that the owner must "declare[] a Contractor Default and formally terminate[] the Contractor's right to complete the contract."  In addition, pursuant to paragraph 3.3, the owner must "either agree[] to pay the Balance of the Contract Price to the Surety . . . or to a contractor selected to perform the Construction Contract."

If the owner complies with its obligations under paragraph 3, the surety must exercise one of a series of options that are specified in paragraph 4.  Paragraph 4.1 gives the surety the option to "[a]rrange for the Contractor, with the consent of the Owner, to perform and complete the Construction Contract." Paragraph 4.2 specifies that the surety may "[u]ndertake to

perform and complete the Construction Contract itself, through its agents or through independent contractors." Paragraph 4.3 permits the surety to satisfy its obligations under the bond by using a bidding process to identify a new contractor acceptable to the owner to complete the project pursuant to a new bonded contract. Finally, under paragraph 4.4, the surety may either deny liability and provide the owner with a statement of reasons or pay the owner directly the amount owed under the bond.

Paragraph 5 describes the notice that must be given to the surety before the owner can enforce its rights against the surety. Under this paragraph, if the surety has not exercised any of the options specified in paragraph 4 with "reasonable promptness," then the "Surety shall be deemed to be in default on this Bond fifteen days after the receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner." The only circumstance in which the owner is not required to notify the surety of a default before seeking to enforce the owner's rights under the bond is if the surety proceeds under paragraph 4.4.1 by either denying liability or tendering a payment that the owner refuses to accept.

## B.  Factual Background

During the fall of 2006 and winter of 2007, various disputes
over payment and the progression of work arose between Sleeper
Village and Moulton.  As a result, on January 30, 2007, pursuant
to paragraph 3.1 of the bond, Sleeper Village notified Moulton
and NGM that it was considering a declaration of "Contractor
Default" and requested a meeting to discuss its various
complaints.  Sleeper Village also contacted United Construction
Company ("UCC") to obtain an estimate of the cost to complete
Moulton's contract.

On February 12, 2007, representatives from Sleeper Village
and Moulton met and discussed several outstanding contract
issues.  Unable to work out their differences, on April 9, 2007,
Sleeper Village sent Moulton and NGM a declaration of contractor
default pursuant to paragraph 3.3 of the bond.  Sleeper Village
noted that it was sending the declaration in accordance with the
termination procedures identified in the bond because "the
Contract [between Sleeper Village and Moulton] requires in
Paragraph 15.02.F that the termination procedures of the
Performance Bond supercede the termination provisions of
Paragraphs 15.02.B and 15.02.C of the [construction contract]."
Sleeper Village indicated that it had identified a replacement

contractor and therefore suggested that NGM waive its various performance options and, as was authorized under paragraph 4.4.1 of the bond, simply pay Sleeper Village what it was owed.

On Friday April 13, 2007, NGM responded to Sleeper Village's declaration of contractor default. NGM noted that it would "proceed to investigate your declaration" but because the surety had not "completed its investigation, [NGM] cannot agree or disagree that section 4.4.1 is the most appropriate route." NGM also noted that while Sleeper Village had contacted UCC, "the surety has not seen any bids submitted by United, or by any other contractors for the completion of the project."

Later that same day, an employee of Sleeper Village's on-site construction manager sought permission from a supervisor to contract with UCC to complete Moulton's contract as UCC was "on track to start Monday." Hours later, the employee received permission to contract with UCC. It is unclear exactly when the contract between UCC and Sleeper Village was formally executed but, according to a "field diary," UCC representatives were working on site as of the following Tuesday, April 18, 2007. Sleeper Village never formally notified NGM that it was in default of its obligations under the bond and UCC ultimately completed Moulton's contract.

## II.   **STANDARD OF REVIEW**

Summary judgment is appropriate when the moving party shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  For the purposes of summary judgment, an issue is "genuine" if it may reasonably be resolved by the jury in favor of either party.  <u>Vineberg v. Bissonnette</u>, 548 F.3d 50, 56 (1st. Cir. 2008).  The substantive law underlying a claim determines if a fact is material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

## III.   **ANALYSIS**

Because I have already determined that Sleeper Village failed to provide NGM with the notice of surety default required by paragraph 5, the only remaining issue is whether that failure relieves NGM of its obligations under the bond.  Sleeper Village argues that its failure to comply with paragraph 5 is inconsequential for two reasons.  First, it asserts that various provisions in the construction contract supersede the notice

provisions of paragraph 5.  Alternatively, it argues that NGM

cannot use paragraph 5 as a shield to protect itself from

liability because it has failed to demonstrate that it was

prejudiced by Sleeper Village's non-compliance.  I address each

argument in turn.

## A.   <u>The Construction Contract</u>

Paragraph 1 of the bond states that the owner and surety

"jointly and severally, bind themselves . . . to the Owner for

the performance of the Construction Contract, which is

incorporated herein by reference."  Relying on the fact that the

construction contract and the bond must be read together, Sleeper

Village argues that paragraphs 6.19 and 13.07 of the construction

contract either expressly supersede paragraph 5 or, at the very

least, result in ambiguity as to whether notice of surety default

must be given before Sleeper Village can invoke its rights under

the bond.  I disagree.

Paragraph 6.19 of the construction contract provides in

pertinent part that the "Contractor's obligation to perform and

complete the Work in accordance with the Contract Documents shall

be absolute."  Paragraph 13.07 (B) permits the owner to obtain

reimbursement for any costs that the owner incurs in repairing

defective work if the costs are incurred by the owner in an

emergency situation or after the contractor has refused to

promptly correct the defective work in response to the owner's

written instruction.  The short response to Sleeper Village's

attempt to rely on these provisions is that neither gives the

owner perfected rights against the surety.  Regardless of any

rights that the owner has against the contractor, nothing in the

construction contract alters the procedures that the owner must

follow before it can maintain a claim against the surety.

Indeed, the construction contract expressly so provides in

paragraph 15.02.F, which states that "[i]f and to the extent that

[the] Contractor has provided a performance bond . . . the

termination procedures of that bond shall supersede the

[termination provisions set forth in the construction contract]."

Thus, an owner must still comply with paragraph 5 of the bond

before invoking its rights against the surety.

## B.   Failure to Prove Prejudice

Sleeper Village next argues that its failure to comply with

its obligations under paragraph 5 does not bar its claim because

NGM cannot prove that it was prejudiced by Sleeper Village's

noncompliance.  Sleeper Village bases this argument on New

Hampshire insurance law, which provides that a claim for coverage

under an occurrence-based liability insurance policy will not be

-8-

defeated by late notice of a claim unless the insured can establish that it was prejudiced by the late notice.  See Dover Mills P'ship v. Commercial Union Ins. Cos., 740 A.2d 1064, 1066-67 (N.H. 1999).  In analyzing this argument, I assume without deciding both that the New Hampshire Supreme Court would treat a performance bond as a contract of insurance, Concord v. Peerless Insurance Co., 272 A.2d 588, 590 (N.H. 1970)(applying rule governing the interpretation of an insurance contract to the construction of a surety bond), and that the court would require a surety to prove prejudice resulting from the owner's breach of its obligations under paragraph 5 in order to relieve the surety of its obligations under the bond.  Nevertheless, I determine that Sleeper Village's argument is unavailing because the evidence in the record demonstrates that NGM was prejudiced by Sleeper Village's noncompliance.

It is undisputed that Sleeper Village contracted with UCC to complete the construction contract without first giving NGM the notice of contractor default required by paragraph 5.  As a result, NGM was deprived of its ability to exercise its rights under paragraph 4 after receiving notice from NGM that it was in default.  When the First Circuit was asked to excuse an owner's failure to comply with a notice of surety default provision in

similar circumstances, it determined under Massachusetts law that

"even if [the surety] must show injury, loss or prejudice [as a

result of the failure to provide notice], it meets this hurdle

given its deprivation of mitigation opportunities."  Seaboard

Sur. Co. v. Town of Greenfield, 370 F.3d 215, 220 (1st. Cir.

2004).  Sleeper Villages has failed to offer a persuasive

argument as to why the New Hampshire Supreme Court would reach a

different result under New Hampshire law.[1]  Accordingly, I

determine that NGM has established that it was prejudiced by

Sleeper Village's failure to provide the notice of surety default

required by paragraph 5.

---

[1] Sleeper Village cites Paiser v. Renaud for the proposition
that the breach of a notice of surety default provision requires
a showing of actual prejudice.  In Paiser the New Hampshire
Supreme Court found that an obligee's failure to provide notice
under the bond was not prejudicial.  Paiser v. Renaud, 149 A.2d
867, 871 (N.H. 1959). However, Paiser is clearly distinguishable
from the present case.  In Paiser, the surety took the position
that it had no responsibility under the bond.  Id.  Therefore,
the failure of the obligee to provide notice of default would
clearly not prejudice the surety because the surety had no
intention of exercising any of its performance options under the
bond.  See id.  In the present case, NGM has not asserted that it
is not responsible under the bond.  Therefore, Sleeper Village's
unilateral hiring of UCC and its failure to provide NGM with any
notice under paragraph 5 deprived Sleeper Village of an
opportunity to mitigate its exposure by exercising one of its
various performance options under the bond.  These actions were
prejudicial to NGM's interests as a matter of law.

### III. <u>CONCLUSION</u>

For the foregoing reasons, I grant NGM Insurance Company's motion for summary judgment (Doc. No. 26). The clerk is directed to enter judgment and close the case.

SO ORDERED.

<u>/s/Paul Barbadoro</u>
Paul Barbadoro
United States District Judge

October 1, 2010

cc:  James E. Owens, Esq.
     Howard B. Myers, Esq.